May it please the Court, Your Honor, my name is Juyeon Han. I represent the appellants and appellants' claims against the appellee-defendant Yolo. I offer here arguments to say that the claims of misrepresentation and products liability did not treat Yolo as a publisher of third-party content, and thus Communications Decency Act did not apply here. I bring two distinguishable facts that were alleged in the pleadings to your attention. The first is that Yolo created a duty for itself as a promisor, not as a publisher, when they stated that they will reveal and ban users who harass and bully other users on the platform. I pose it as a promisor, as someone who has made a promise, a statement of a promise that another person would have relied upon. And just to avoid confusion, it is a misrepresentation claim, but I will focus on the statement of that misrepresentation which contained a promise. And I read to you the quoted promise that had been stated on the app of Yolo. I quote, No bullying. If you send harassing messages to our users, your identity will be revealed. This is a conspicuous pop-up notification that all users had to read before they can use the app of Yolo. Are you asking us to re-characterize the claim in your complaint as a contract claim? Is that what you're asking us? No, Your Honor. There is no need to re-characterize that claim, and we have intentionally not included a breach of contract claim. However, I draw this analogy of the content of the statement as a promise solely because there was a reliance upon this statement, which was so identifiably concrete. It did not say we may ban users, or we will try to ban users, or there is a possibility that we may ban and reveal users. It said we will reveal and ban the users. I quote from another context where this was attached to another conspicuous pop-up that every user had to see. Yolo has no tolerance for objectionable content or abusive users. You will be banned for any inappropriate behavior. This was another conspicuous statement that Yolo had given to its consumers. And because of the strong language of will attached to reveal and ban, which are activities that Yolo has promised its consumers it will do, and is conspicuously stated in language that all of the users had remembered, relied upon, which we have included in the pleadings, this is very integral to the factual situation that distinguishes Yolo from all the other social media apps that perhaps has come to this Court's purview. The second fact that is very important is that Yolo itself designed, marketed, and distributed a product that was inherently dangerous. And we are not talking about the inherent dangers of just anonymity. Yolo was designed as a one-sided anonymous app, which was made for senders to use anonymous messages to target non-anonymous receivers. So the receiver... In Levengy's app, it was a speed recording, or a speed in an incentive system. And the courtment we made clear that it had nothing to do with content that was published. But your negligent design claim is all related to content that was published. It may not always be related to content. I understand that there may be some nexus to a content-related material. But I do want to pose that there are so many conflation of factors that need to be contextualized here. First, yes, there was an anonymous, one-sided anonymous targeted messaging function. However, what it meant is that this was constructed in a way that disabled the receiver of the message to take any measures to find out or to respond without publicly displaying the message to other users and asking, who did this? Please swipe up and reveal yourself. But that may also be somewhat close to content. The other thing that Yolo had promised was a safety device. And that safety device, again, as I mentioned in the first fact, was reveal and ban. It said, if there are harassing users, we have this device as a safety measure, which will reveal and ban users and take away... That still goes to the content. It's not always related to content. The fact that Yolo had put itself into a position where it has said, we have control over whether to provide a shield of anonymity or not, alongside the users who has also the control to swipe up and reveal themselves or not, is a design structure. Much like in Fair Housing, there was a structure where a question and answer had to be input. And that was template in Fair Housing was actually a violation of the Fair Housing Act itself because it required disclosure of gender and the like. But like in Caravan of Images, simply providing a template does not make the... does not cause the internet provider to lose immunity. And so, is this template that you're talking about itself a violation of some law? It is not a violation of law. And as Your Honor had also recognized in the Fair Housing decisions and the en banc decision, the violation of the law itself in that case of Fair Housing was something that was separate from whether CDA applies to the scenario. But the take away from that is that there are sometimes designs and structures that are so put in place that the users are induced to take a certain approach when they post content. And that is dangerous. And here, there are even more dangerous features. This was a Caravan of Images splash which allowed a user to give intimate information about who they were, their profile, etc. That we said was fine. That did not cause the publisher to lose immunity. It was only in Fair Housing where they were actually engaged in violating the Fair Housing Act that we said they were a co-creator of the content. And in addition to that, and those distinctions were made in those two cases, and Fair Housing was very cognizant of the context of an adult dating app that was meant to have licit information put into the profile setting in Caravana versus Fair Housing where the context is very different. The same kinds of sex and sexual orientation inputs into a profile in this context would have been so dangerous because it could lead and induce the intent of discrimination. And here, we have to also look at the context of this very unique app. This was marketed and sold to teenagers. So this is about a one-sided anonymous app where people cannot talk to each other, but one person is receiving anonymous apps and they are all 13, 14, 15, 16 year olds. And you have to know exactly what was decided. So we need to know why that is in publishing content because either a message has a name on it or the message doesn't have a name on it and it all sounds like content to me. Actually, if we were to put it in a context of a benign message, let's say that I checked into a hotel yesterday and I got a note that slipped under my door that says, I will come get you. And it could be any kind of content. It might be that my clients were going to come and get me for dinner. But if I didn't know where it was coming from, it was just on a blank piece of paper, then I may be confused as to who is going to come and get me. Maybe it's a threat. So regardless of what content it is, regardless of whether it was a publisher function or not, the system that is designed to allow for one-sided anonymity with no recourse for the receiver to actually enforce the standard safety feature of reveal and ban, the safety feature that did not work, that is a problem here. If we reverse and remand, what would you put out for the evidence in this case? We would have so much to discover. We would first ask what evidence they had to understand what kinds of safety hazards there were. We would actually ask for all the instances where the children were asking for reveal and ban and they were denied because my client had, after the fact of her son's death, had asked four different times to ask for the reveal and ban feature to be enforced, as stated, and she received zero response from YOLO. Even after she had stated that her son had passed away from cyberbullying, there would be so many other ways to understand the back end of the system in order to understand the harm, but also why the design was input in such a way and how that affected the profitability. And, you know, as we talk about this, the duty here is so distinct from a publisher duty because, again, I repeat that the duty that YOLO had was simply to follow what they had stated they would do. There's nothing about publisher, just like in Barnes. Barnes was all about removal of a post of obscene material that a woman's ex-boyfriend had posted, and the duty that followed was to do what they had promised her they would do. So, in Barnes, we said the negligent undertaking claim failed. It was only when we re-characterized this promissory estoppel claim that we said it succeeded, and you have just told me that you don't intend to have your claim re-characterized as contract or promissory estoppel. So, under Barnes, it would fail as a negligent undertaking claim. I think Barnes was far more wise as this court had given us because it did not say it's only promissory estoppel, the formulaic version of that claim. It said that if the duty is coming from something that is distinct from a publisher duty, even if the resulting activity is to remove posting, which is a publisher activity, if the duty springs from somewhere else, then that's something that the court will consider, and CDA would not apply. This is such a clear case that is just like Barnes, and so whether we characterize it as promissory estoppel or a promise made in a misrepresented statement, the result of the wisdom of Barnes would be that CDA does not apply. How do you get around dry off? Dry off is another case that simplistically talks about anonymity, and dry off was a completely different website. This was where everybody had the benefit of anonymity, but they also had a profile attached to every single person. So, it wasn't a one-sided complete anonymity like the ones here. It was also not marketed to 16, 14, 15, 13-year-olds. It was a very generalized website, and it reinforced communication between multilateral parties. Although they had a personality index, or whatever you called it, the posters were still anonymous, were they not? The posters could have an anonymous way of characterizing themselves. However, it was, in the way that we see it now, it is pseudonymous because there is an identifier that is from which you can reply, and they can see somebody had replied, and it may not go toward an identification measure. That's the only thing that invokes an anonymity, but this is a completely differently designed app. Here, there was no way to understand. It was a blank piece of paper with a note written. You do not know who sent it, and you cannot even reply without publicly humiliating yourself and saying, I got this note from someone. Everyone, please take a look. But a buyer in dry off wouldn't know who was offering the drugs at what place. Is that true? That is true, but that is basically true of all profile-making websites in this digital era. But the distinguishing factor here is that there was no way to even reply in this case without publicly showing what had been received. How would somebody, using the dry off platform, reply to a drug peddler saying, I'll buy it five instead of ten? Well, because there was a way to communicate both ways in Dirov, in the site that Dirov was about. There was no way of communicating with. That is true. For example, it might be that if you and I were on the Explorer Experiencer app, in Dirov's case, we want to know that we're talking to one another. But I can still direct messages to you, and you can direct messages to me. But in the case of YOLO, I would be exposed. You would know that you're giving me questions, but you're behind a screen. I would not even know who was asking me any question. And in order to reply to you, I have to show everybody in this room what I had received as a question. So that's the... Could a responder in Dirov show everyone in the room that he's willing to pay five rather than ten? No, there was a way that they can communicate. Directly? All right. And... Well, that's the distinction. There's direct communication with a sender, an anonymous sender in Dirov, and there's no direct communication here. How does that affect anything? It affects the contextualization of these facts. There are harms that come solely from the one-sidedness of the anonymity. The abuser wants to be the abuser, so you're telling him, don't abuse me. You could say that, and other bystanders in Dirov could even intervene and say, hey, I saw this anonymous posting that you're selling illicit drugs. I'm going to call the police, or I'm going to ask the voting board to identify you and try to see who you are. There were requests that were available. Sure, this was a hot bath outside the building. There was no way to ask any guardians, school officials. No law enforcement could ever track who had been sending what. You didn't know if it was one person sending it to you, if it was a particular person sending it to you, or if the entire room thought the same opinion of you. This was how messy this act was. But it was targeted, again, to teens. Do you want to save some time for rebuttal? Yes, five minutes if possible. You're down to three minutes, 43 seconds. I will save for rebuttal. Thank you so much. Okay. Good morning, Your Honors, and may it please the Court. Nick Pucci on behalf of Yolo Technologies, Incorporated. During the hearing in the Dyaroff matter, there was significant time spent explaining how did the product work, how did the underlying product in Dyaroff connect the users to talking to each other. I think we need to spend a few minutes just to understand exactly what this app did, because per our motions to strike in these proceedings, we have flagged that the description that the plaintiff has offered for the Yolo app has evolved. But let's just break open what it is. There is Snap. That is a platform that allows users to post content. I believe all of you are, or at least most of you are familiar with that platform from prior cases. The Yolo app sits on top of Snap. A user has to sign up for it. They have to download it. They have to plug it onto their phone. They then post on Snap, or they post through Yolo, and solicit anonymous feedback on their post. For example, take a look at the photo of the turban I'm wearing today. What do you think of the color? You can post that, and I could post that, and I would get anonymous feedback from people. Here's the other critical point for background. The people who see those posts are people that I have agreed to connect with on Snap. The way Snap works is it's a double opt-in. If I wanted to connect with Judge Bail on Snap, he would have to agree to it, and I would have to agree to it. I would not have to broadcast my photos to you and then send what you thought about it anonymously or anybody else. So I would be— Would he withdraw from that at any time? Absolutely, Your Honor. You can simply delete the app, or you could stop making posts that are asking for anonymous feedback from people you've agreed to connect with on Snap. There's control there, and I think that's important if we're talking about context. Is there any supervision by any person as to what content is going into it? Could you repeat the question, Your Honor? Is there any supervision by someone on what content is posted on this? No, Your Honor. We don't mix up with the content. We stay away from it. What about the representations that Ms. Hahn read in saying, if you bully, then you will be revealed and you will be banned? Correct. That's baloney. You don't do it. Well, they do do it. First of all, that's important. Do you do it or do you not do it? They do it at certain times, for example, and this wouldn't be in the record, but at certain times the app would use different types of technology filters to try to scan for bullying content and try to automatically filter those contents. Would they find out who's posting it? Potentially. This is designed to be a guideline, Your Honor. This is a guideline that's not followed? Well, it's not followed clearly, and it doesn't say when we're going to reveal their identities. It doesn't say when we're going to ban them. It says that there is no bullying on this platform, and if you do it, your identity will be revealed and you will be banned. Right. It does say that. That doesn't say what. It doesn't say how. The problem with that is, first of all, let's be clear, this is a guideline designed to discourage people from sending inappropriate or abusive communications. That doesn't actually, it is protected directly under Section 2. What you're saying is you will be banned and you will be revealed, parenthesis, but maybe not by us. It could be by law enforcement, who, of course, we've been actually counseling. This is a wish, not a promise, is what you're saying. I think it is a guideline that we've provided. The reason why, if we take a step back and say why, then you'll know. If someone talks about guidelines, let's leave that out. Sure. What you're saying is this is a representation by the company of what will happen, right, but not necessarily by us who make the representation, is that what you're saying? It could mean that because there are instances. It does mean that because you're not saying we will investigate, reveal, ban. Correct. Although there are instances where the app has done that. It's not part of the record, but I'll represent to you that there have been instances where someone's identity has been revealed or has been banned for sending abusive communications. So a full representation might be you may be revealed and you may be banned and it may be by us or it may be by somebody else and it may happen or it may not happen. That would be a more full and complete representation, right? Something along those lines probably would have been better if the app would have been done. It would have been legitimate. Right. But again, if you keep going, this is a guideline. The problem is the app is sticking their finger out and saying no bullying. Right. That's the idea. Why isn't this like the promise in Barnes under the promise of stop all analysis? Why is it different? Yeah, why is it not like that promise? Well, first of all, I think as you asked earlier, Your Honor, there is no claim related to contract for promissory stop bullet and according to plaintiffs, they're going to stay away from that probably. Again, it's conjecture, but probably because they'll have to then deal with the terms of use which limits our liability in the situations anyway. I don't know for sure. But they've had two versions of the complaint. They had over a year, I believe, to put up the second version of the complaint. No contract claim in sight, nor did they ever request it to amend it for that purpose. In Barnes, we seem to just correspond to a re-characterize the claim. Say it again, Your Honor. In Barnes, we just correspond to a re-characterize the claim. At least that's how I read the opinion. Right. Well, in Barnes, you said the negligence claim, for example, this court said that the negligence claim still falls under the immunity. It's only this promissory issue. And we really do need to be clear about this misrepresentation issue overall. This is a square peg in a round hole. This is a circumvention of Section 230, which this court is well aware of, certainly from its opinions, how we feel about that. In redknights.com, this court said that websites are complicated and there's always going to be close cases where a clever liar can try to find an argument around it. You can be artful in trying to circumvent Section 230. We want to be aware of that. We want to make sure that we don't gut the value of that statute. And that's essentially what the misrepresentation claim is doing. If you dig in even deeper, what exactly? We were talking about the language a minute ago. What are they saying that we misrepresented? They're saying that you promised or you told us that you would ban people or reveal their identities and there should be no bullying. But they're basically saying, hey, you did not regulate content. You didn't moderate content. How would we determine if somebody was bullying somebody? How would we determine if there's abuse of language? We would have to look at the content. We would have to moderate it. We would have to kick people off or make decisions. That is a publisher activity, and that is immune under Section 230. So the problem is, even though they try to get around 230, if you look at the actual substance, they're not ready to do it. How do you represent that you're ready to do something? It's a pretty good waiver of your immunity under 230. I don't think that's accurate, Your Honor. I mean, I certainly understand the courts holding in Barnes regarding the promise of restockable, but in this situation, they're asking for content moderation, and this is very much viewed as a guideline under Section 230, Your Honor. One of the obvious purposes is to allow free communications on the Internet. One of the other purposes of it, which is cited in Plaintiff's brief, is that they want to encourage platforms to provide safeguards without having to worry about becoming liable on the level of a typical publisher. And so that's what we're doing. There's even references in the briefs that suggest you shouldn't have said that at all. You shouldn't have said no bullying. You shouldn't have made the threat or suggest or promise that you would ban somebody with a regular identity. You shouldn't have done that. You should have just stayed quiet. Well, that is contrary to the underlying purpose of Section 230. Part of the idea of this law was to provide some protection, some safe harbor for platforms to try and encourage people to communicate in a decent way, and that's what that is. If you look at the language, it says no bullying. What promises no bullying? That is clearly an instruction to say, hey, come correctly, act appropriately when you're using this app. By the way, the same app that people use to solicit the anonymous feedback they're receiving. There was a hotel note example provided. But it's different when you say, hey, I need to connect with some other guest in this hotel, and I'm also going to put a sign saying, hey, send me messages in my door. That's what was happening. They said, hey, please send me anonymous messages in the door. What do you think of this photo? You know, they post a photo of themselves in the door and say put a note underneath and tell me what to think about it. That's a little different than receiving a creepy note from somebody who you have no connection to whatsoever and who you haven't solicited feedback from. So I wanted to also talk a little bit about anonymity. There's this idea in the complaint and in the papers that somehow being anonymous equals inherent danger. This court has filed directly against that in Birof specifically. So that alone would suggest that it basically guts their parts. Birof didn't really focus on anonymity, did it? Actually, the website was anonymous, but it didn't really focus on that as being an issue.  It's on 1095 to 1096 of that decision where it says an anonymity feature alone is a content neutral feature with no inherent danger or predictability of harm. I think the idea that because something's anonymous makes it inherently dangerous is not true, especially when you have a content neutral messaging platform like YOLO. We also need to be honest. I think we need to take a step back. The Internet is a complicated and somewhat anonymous place. Whether somebody uses their actual name or a pseudonym or some type of anonymous identity, the whole idea that people on the Internet are relatively inhibited when they communicate with each other, that's always going to happen. And so when they say, oh, because your messaging platform had an anonymous feature versus one that didn't have an anonymous feature, you're just more dangerous. The user allows other people who he knows to send messages to him. There's no anonymous anonymity there because if he doesn't allow the other person to send the message, the other person doesn't send it. Isn't that correct? That's correct in terms of how this app works. Just to be clear, Your Honor, it's not just people who he knows. It's people who have double opted in to connect with each other. So it could be strangers. They don't want to see. I'm sorry. I don't see it. Sure. You have the case citation 934 F3D. I'm looking at 1093. 1093. It's 1095 and 1096. I can try to pull up the specific language if you like. This is the background section, and I don't see any holding at all. On page 1100. I'm sorry. The pen size should be 1100. And if I may, when we talk about some of the other cases out there, let's look at the underlying technology. For example, in Carathono, the underlying technology, the Yobo app is far lighter, far less invasive. When you look at the underlying platform, if you recall, Your Honor, in that situation, that platform had an algorithm that connected users to talk to each other about potential topics that they had in common. We don't do any of that. All we do is provide an anonymous messaging app that allows the own user to post content and say, Hey, what do you guys think of this? They can do a poll. They can say, Do you like it? Do you not like it? Right? And so when you solicit anonymous feedback or conduct a poll inherently, you're actually asking. It's very likely you could get positive content or negative comments back. That's how polls work. And so this is, if you look at it in terms of what our app is doing and how involved we were with directed communications, it is far less involved, far less invasive or impactful than the underlying technology in Dyaroff or Carathono. So that's just with regards to those cases. The question was also asked, if we allowed this case to proceed and discovery was allowed to be completed, what would you look for? The problem is, is basically what they'd be looking for is content moderation. Did you moderate content? Did you act as a publisher? And, again, what would you do? Well, they're asking for a failure. They said one of their claims is a failure to warrant a claim. So they say anonymity is inherently dangerous to children. I still didn't find your quote in the case, by the way. I'll look again. And they have the duty to warrant is independent for moderating content. In other words, they could have just told parents, by the way, this is a feature that allows anonymous communications. And studies have shown that this is harmful to children. Why does that claim fail? Sure. So just to pull up a quote, the specific language, it's quoting a quote that says, anonymity equals promoting drug transaction. The allegation that the user, anonymity equals promoting a drug transaction is not plausible. Okay, that's a little different than what you said. That's where we're coming from. They said anonymity doesn't promote drug transactions. That seems to be a little bit different. So I don't see why you can't have a failure to warrant a claim in this context. So could you address that? Sure. In order to have a failure to warrant a claim, I think I'd go back to the idea that just because this allows some anonymous messaging, which, again, is solicited by the user, doesn't inherently make it dangerous and doesn't trigger the need to provide a failure to warrant. Well, that could lose on the merits. The question is whether it gets past ACDA anonymity. Right, but then I guess the next point would be is that what are we warning of? We're warning of communications, the content of communications. And then they have a problem with Section 230. Because, again, the way that YOLO apps is, it's a neutral platform that allows messaging to happen. It has an anonymous feature built within it. It allows people to solicit anonymous feedback from people they've connected with on Snapchat. Where is the duty to warrant that? Why would a failure to warrant a claim survive given the protections afforded under Section 230? It would require us to go above and beyond engaging in activities that we would not be required to do With regards to the next couple of minutes, I can just go briefly through their claims. So with regards to misrepresentation, as I mentioned before, it appears to be an attempt to circumvent, clearly circumvent Section 230. And the same applies to all the kitchen sink, that they've lopped on top of it. The whole idea, when you look at the frequently cited quotation in roommates.com, it says, when you boil down the gist of their claims, if they are forcing us to decide whether to exclude material that third parties seek to post online, it is perforce immune under Section 230. And that is essentially what that misrepresentation claim revolves around. They are saying, you said you were going to do something. Well, what was that thing that we were going to do? It was to regulate the content. It was to analyze whether someone was being a bully, to decide whether to take them and or their communications off the platform. That is perforce immune under Section 230. So again, you have to boil it down, because it's trying to circumvent 230, but that's where it comes out to. Section 230 also directly bars, directly bars an appellant's claims for content moderation as it relates to the platform's general safety guidelines and failure to implement. That was also a holding from roommates.com and the Barnes Matter. Did you want to address the negligent design claim? Sure. Well, the negligent design claim, again, rests upon the idea that having some type of anonymous messaging feature somehow makes it inherently dangerous. Now, their description, again, of the platform has evolved over time, but even if we break out the full description, I don't see how you can have a negligent design when you have users who are soliciting anonymous feedback and can turn off that app any time they want if they're not interested in getting feedback in the future. But to keep posting and keep asking for feedback from people that you've already agreed to connect with mutually, that's, I think, where it becomes problematic. I think when you look at the design, whatever design they're suggesting is actually existing on the platform is inaccurate. The user didn't request that the feedback be anonymous, did he? Yes, they did, because the whole idea, Your Honor, is you post something. I see. YOLO represented the feedback would be anonymous. Correct. So the person took off. You say, how do you like my shirt today, guys? And then all of a sudden, and you do it via YOLO, you allow a YOLO sticker to be on there. People who you've connected with will see the question or see the photo and then start responding to the box. You seem to be saying the design is not negligent. I don't think that's the issue, right? The question is whether a negligent design claim is barred because of CDA immunity. That's the question. Correct. And, of course, it is. It falls directly within protection of the CDA. But we have 11b snap, which allowed a negligent design claim to go forward. Yes, but the product in Lemon had nothing to do with speech. It just basically was a tool that would encourage them to post certain types of content. It would lead people to provide them with rewards, providing examples of them speeding and breaking the law. There was a carrot and a stick, and they hit a carrot, and they said, speak and post about it. Here, there's nothing like that. We don't control any of the content whatsoever. The only person who controls the content is the one posting and saying, what do you think about X, Y, and Z, or giving your feedback on it. Section 230 is clear. The YOLO app is obviously an interactive computer service, and it should not be treated as a publisher of third-party statements in this instance. It is a content-neutral app that allows users to solicit anonymous feedback on their own. All right. I think we have your argument. Thank you. Thank you. Your Honor, may I move to strike everything that has been argued that is off the record, that there had been technology that was developed to scan and respond to any of the messaging. None of those things are from the record, and those things properly belong to the realm of discovery which we were barred from. Please disregard those arguments, and I move to strike those parts of the oral argument. Circumvention of the Communications Decency Act is what's going on here. The circumvention of liability is what's going on here. We're not trying to circumvent and create claims that bypass the CDA. This case has nothing to do with CDA. It is not even a closed case. This is a case where YOLO has created itself, positioned itself into fulfilling and performing, and they have not performed. There was an argument made about children soliciting, voluntarily soliciting anonymous comments from one another. But in truth, what is evident from the record is that children were misled and lured into joining the app because they thought there was a safety feature of reveal and ban at the end of the day, which never functioned. That is the safety defect claim here. The negligent design is that the safety switch that was supposed to turn on did not turn on. And I have to say that this is very different from that of a tenuous relationship between content and the hearts here. Carson Bride, at the remaining last minutes of his life, was trying to activate the revelation of identities of his users per YOLO's own statements. That is a direct harm. And, Judge Ikuda, you made a very important notation in your concurrence in the roommate's case that there needs to be something very direct, and here is something very direct. Carson would not have tortured himself at the last moments of his life had it not been for the misrepresentations and the negligent design of the safety feature. That never worked. What about as a pet case? Did the user withdraw entirely? I'm sorry, Your Honor? Did the user withdraw from the use of this at any time or are you stuck with it? That is something that can be sought in discovery about when and how users dropped. But it is also something in discovery to ask why users withdraw or draw out of the app because they probably were lured, they were burned and harmed, and then they would withdraw. So that initial use and misleading and being harmed by the misrepresentation is still ongoing regardless of whether there was an opportunity after that to withdraw. So that does not do anything to absolve YOLO from the misrepresentations and the harms that it has caused. However, it is very important to understand that though content moderation and monitoring may be the best solution to perform a duty that itself has put into place to perform, that is not the only way here that the duty could have been performed. And thus, this is not about content moderation at all. And with that, I wrap up my argument. Thank you very much, Your Honors. We thank both sides for their argument in this complex case. And the estate of Carson Bry versus YOLO Technologies is submitted. And with that, we are adjourned for this session. All rise. This court, for this session, stands adjourned.
judges: Siler, BEA, IKUTA